THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MELVIN A. RICE, Defendant-Appellant.

First District (Second Division)   No. 1—90—1433

Opinion filed August 25, 1992.

Rita A. Fry, Public Defender, of Chicago (Michael Davidson and Alison Edwards, Assistant Public Defenders, of counsel), for appellant.

14

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Matthew L. Moodhe, and Susan Schierl, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

A jury found defendant Melvin A. Rice guilty of aggravated battery and he was subsequently sentenced to 10 years' imprisonment. On appeal, he contends that the State improperly elicited testimony in violation of a motion *in limine* regarding a pending sex offense charge against him; the circuit court improperly restricted his cross-examination of a State witness; the circuit court erroneously admitted alleged prejudicial hearsay; he was denied a fair trial by several instances of alleged prosecutorial misconduct; the circuit court erred in instructing the jury on self-defense over his objection; and the circuit court improperly sentenced him to an extended term.

Evidence at trial showed that in November 1989, Demetra Anderson met defendant while both were students at Harold Washington College in Chicago. Thereafter, they began a relationship which ended during the first week of December 1989.

According to Anderson, on December 11, 1989, while she was home alone in her apartment, defendant telephoned three times between 8 p.m. and 10 p.m., wanting to talk about renewing their relationship. During each of defendant's calls, he asked Anderson if he could come to her apartment that evening; Anderson repeatedly told defendant that he could not. At approximately 5 a.m., Anderson was awakened by someone ringing her doorbell; when she went to the door, she saw defendant, who told her that he needed a place to sleep because he could not go home, but that he did not desire sex. Although Anderson did not want defendant to stay with her, she "felt sorry" for him and allowed him to enter her apartment. Once inside, Anderson told him to sleep on a mattress on the floor of the living room; defendant, however, wanted to sleep with Anderson in her bedroom. Anderson again told defendant to sleep in the living room and he again refused. Not wanting to argue with defendant, Anderson went to her room. Defendant then followed her into the bedroom; when defendant asked Anderson if they could have sex, she refused.

At that point, defendant "snapped" and became "violent"; he yelled at Anderson and, when she sat on the bed, hit her in the face three times. She fell back onto the bed and began screaming and hitting the bedroom wall in order to summon her neighbors for help. When she began screaming, though, defendant pushed a pillow onto

her face and told her to stop. Because she was suffocating and gasping for breath, Anderson struggled with defendant, scratching him in the face.

After Anderson told him that she would stop screaming, defendant removed the pillow from her face, though he still was on top of her. When Anderson began yelling again and reached for the phone, defendant choked her and hit her twice more, near the eye and nose.

Still screaming, Anderson begged defendant to let her get some ice for her face, which was bleeding. Defendant, however, refused and just looked at her face, stating, "Fucked up your pretty face, didn't I." Defendant then ordered Anderson to stay in the bedroom.

Shortly thereafter, while Anderson was in the bedroom, crying and wiping up her blood, the doorbell rang. Defendant told her not to move while he went to answer the door; Anderson, however, ran to the window adjacent to the front door and, pulling back the towel that covered the window, began screaming, "Help, somebody please call the police. He's trying to kill me." Defendant then told her, "Well, you got your police," and opened the door after about two or three minutes, letting the police in. After the police arrived, Anderson was taken to the hospital, treated, and released.

On cross-examination, Anderson acknowledged that she had recently pled guilty in Federal court to unlawful secretion of the mail. She further admitted that she had once had a drug problem, but stated that she had not taken any drugs for 18 months and was not under the influence of drugs during the fight with defendant. She explained that, though she had regained custody of her son, she allowed her son to live with her great aunt because "it's the best place for him because I'm not working and I'm a full time student." Defense counsel attempted to question Anderson about her drug use; however, the court limited the examination regarding any recent drug use, stating that defendant was unable to present any evidence or offer proof to support his accusation that Anderson did not have custody of her son because she continued to use drugs.

The court further limited defendant's cross-examination of Anderson concerning discrepancies between what she had said her follow-up instructions were when she left the hospital and what what was contained in her written instructions on the hospital's discharge instruction sheet. Defense counsel attempted to show that, although Anderson testified that the doctor had told her to return to the hospital for treatment, the written instructions required her to return for treatment only "if needed." Thus, defendant attempted to show that Anderson's injuries were not as severe as she had led the jury to be-

lieve. The circuit court sustained the State's objection to the admission of the discharge instruction sheet from the hospital, noting that it was inadmissible under the business records exception to the hearsay rule.

Chicago police officer Marie Watkins testified that, on December 12, 1989, at approximately 5:15 a.m., she and her partner responded to a battery-in-progress call occurring at Anderson's apartment. Upon arrival, Watkins heard a woman screaming, "God, help me. Somebody, please help me. He's trying to kill me." Watkins then ran to the front window, where she saw Anderson with a bloody face, screaming. The two officers knocked on the apartment door and announced their office; after several minutes defendant opened the door.

While Watkins' partner isolated defendant from Anderson, Watkins attempted to calm Anderson, who was hysterical and screaming and whose face was bloody and swollen. Shortly thereafter, Anderson was taken to South Chicago Hospital for emergency treatment.

Placing defendant under arrest, Watkins and her partner transported him to the police station. While in the squad car, defendant voluntarily told Watkins, "Do you want to know what happened? *** That bitch scratched me on my face. That's why I hit her. *** I don't let no bitch hit me in the face and get away with it." Defendant also told Watkins that if he did not have handcuffs on he would "kick [her] ass," because "every woman needs to get their ass kicked *** once in a while." After arriving at the station, Watkins told defendant that hospital personnel had informed her that Anderson might lose an eye, to which defendant responded, "I don't give a fuck if that bitch lose[s] her eye. She shouldn't have scratched me in my face." Watkins noticed that defendant had a small scratch on his face, less than an inch long and not bleeding.

Assistant State's Attorney Laura Lambur testified that she spoke with defendant while he was at the police station. There, defendant told Lambur that he had hit Anderson because she had scratched his face. Lambur noticed that defendant had two or three "small marks" on his cheeks; according to Lambur, defendant's "skin wasn't broken. Rather it looked like if you take a nail and scratch your own skin when your skin is dry."

Mohammed S. Baig, M.D., the emergency room physician at South Chicago Hospital, testified that he treated Anderson immediately after her arrival; he observed that her eye was extremely swollen, tender to the touch, discolored, and she had a laceration over her left eyebrow which required four stitches to close. Anderson also suf-

fered from a blow-out fracture of the left orbit of her eye, consistent with a severe blow to the eye. Before she was released, Anderson was given a cold pack and two nonprescription Tylenol tablets.

Defendant testified that, after meeting Anderson, he began an affair with her despite being married and having a five-year-old child. On the night of December 11, 1989, he called Anderson three times; during the last call, sometime between 10 and 11 p.m., she asked him to come over. Because defendant did not arrive at Anderson's apartment until about 3:30 or 4 a.m., she became upset. After telling Anderson that he just needed a place to sleep, she told him to sleep on a mattress in the living room; defendant, however, explained to her that he did not want to sleep there because it was very cold and the heat was not on. Following their disagreement as to where he would sleep, defendant followed Anderson into her bedroom, where he took off his coat and shoes and began to get into bed, as he had done in the past. Anderson, unprovoked, then scratched defendant's face. Defendant reflexively reacted by hitting Anderson three times within a five-second period, unaware that he was hitting her in the face.

Defendant panicked when Anderson began screaming because he did not want anyone to think that he had hurt her intentionally. He reacted by placing a pillow over Anderson's face, but removed it when he realized that it was not the right thing to do. He then began consoling Anderson and asked to see her eye, suggesting that he get a towel to clean her face. Approximately four or five minutes later, while defendant was on his way to the bathroom to get a towel, the police arrived and Anderson inexplicably ran to the door and began screaming. Defendant then immediately let the police into the apartment.

Defendant denied, however, telling the police officers that he had intentionally hit Anderson because she had scratched him. He further denied that Watkins told him that Anderson might lose an eye.

Following closing arguments, the jury found defendant guilty of aggravated battery. During the sentencing hearing, after arguments in aggravation and mitigation, the circuit court noted that defendant had a prior felony conviction which made him eligible for an extended-term sentence. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(1).) Stating that "I only wish that I could sentence you to more time, Mr. Rice, because it just seems to me that this is just an outrageous crime and you deserve more in my opinion listening to the evidence," the court sentenced defendant to a 10-year term of imprisonment.

I

Defendant initially contends that the introduction of evidence of a pending sexual assault charge against him in violation of a motion *in limine* deprived him of a fair trial. The State responds that any error was immediately cured by the court's promptly sustaining defendant's objection, immediately admonishing the jury to disregard, and later instructing the jury to disregard stricken testimony.

In the instant case, the circuit court granted a motion *in limine* barring the introduction of a sexual assault charge pending against defendant. During the State's redirect examination of Anderson, however, the State inquired as to a January 3, 1990, telephone conversation between defendant and Anderson, asking her, "What, if anything, did he say to you on January 3rd when he called you collect?" Anderson testified that "He asked me to drop the charges. To don't come back to court. That he would pay me and that he would pay my doctor bills if I didn't come back to court and he told me that I knew he was in the system for attempted rape already and that he was lookin' at some time—." Following an immediate objection by the defense, the court instructed the jury, "That last comment. The jury is instructed to disregard that."

It is plain error for a prosecutor to imply that a defendant has committed crimes other than the one for which he is on trial. (*People v. Valdery* (1978), 65 Ill. App. 3d 375, 378-79, 381 N.E.2d 1217.) An instruction, however, to disregard evidence ordinarily cures error in its admission. (*People v. Keen* (1990), 206 Ill. App. 3d 940, 954-55, 564 N.E.2d 1314.) This is particularly true when the improper testimony is not directly responsive to the question and is promptly stricken, with an instruction to the jury to disregard it. *People v. Thomas* (1981), 96 Ill. App. 3d 443, 454, 421 N.E.2d 357.

In the present case, Anderson's reference to defendant's pending "attempted rape" charge was not solicited by the State's question in a calculated attempt to prejudice the jury; rather, it appears as an inadvertent remark which went beyond the question asked and was then quickly stricken by the court and the jury was instructed to disregard it. Nonetheless, defendant asserts that this court, like the courts in *People v. McCray* (1978), 60 Ill. App. 3d 487, 377 N.E.2d 46, and *People v. Harges* (1967), 87 Ill. App. 2d 376, 231 N.E.2d 650, must find that Anderson's statement was so "extremely inflammatory" and "volatile" that it prevented the jury from dispassionately evaluating the evidence. Neither *McCray* nor *Harges* is apposite.

In *Harges*, the defendant's conviction was reversed because the State committed reversible error when the prosecutor asked the defendant on cross-examination whether he had ever seen the police station before. Finding that the prosecutor's question was an obvious attempt to bring to the jury's attention the fact that the defendant had been at the police station on a prior arrest, the court reversed defendant's conviction. *Harges*, 87 Ill. App. 2d at 379-80.

In *McCray*, the prosecutor, after establishing that the defendant lived in a poor neighborhood and had a limited education, asked him if he had "[a]ny occupation other than robbing people." Finding the statement "inexcusable" and noting that such prosecutorial misconduct strongly tended to lessen the credibility of the defendant, the court reversed the defendant's conviction. *McCray*, 60 Ill. App. 3d at 489-90.

Unlike *McCray* and *Harges*, the State in the case *sub judice* did not elicit the response now challenged by defendant. Nonetheless, we note that the prosecutor's question was broad and open-ended. We recognize that occasionally a witness' testimony will be volunteered and unresponsive; however, this does not diminish a prosecutor's responsibility to uphold a court's evidentiary rulings and orders *in limine* and, to that end, communicate to State witnesses the importance of not testifying to restricted material. It is axiomatic that prosecutors have a certain amount of control over their witnesses; in the instant case, the State neglected to keep Anderson's testimony within the bounds delineated by the court.

We find, however, that based upon the overwhelming evidence of defendant's guilt presented at trial, defendant was not denied a fair trial by Anderson's response to the State's general question. Notwithstanding defendant's contention that "[w]hen the jurors heard that 'he was in the system for attempted rape already,' they were given an improper picture of defendant as someone with a history of intentional violence against women," it was the evidence at trial and not that one stricken statement that gave the jurors the impression that defendant was violent towards women. Anderson's testimony related the brutal nature of the beating which defendant gave her. Watkins' testimony that defendant wanted to "kick her ass" and that he stated that "every woman needs to get their ass kicked" further suggested to the jury that defendant was violent towards women. Accordingly, we find that the one complained-of statement did not so unfairly prejudice defendant that he was denied a fair trial. See *Keen*, 206 Ill. App. 3d 940, 564 N.E.2d 1314; *Thomas*, 96 Ill. App. 3d at 455.

Defendant's final contention, that the State's comment in closing that "You know with friends like that you don't need enemies because you wouldn't live very long with a guy like that" magnified the unfair prejudice, has no merit. Here, the State was referring to the brutal nature of defendant's crime and not in any manner commenting upon his pending sexual assault charge.

## II

Defendant next contends that he was denied his sixth amendment right to confrontation; specifically, he maintains that the court erred in restricting his cross-examination of Anderson. Defendant argues that he should have been able to examine Anderson on both her alleged current drug use and on the written instructions from the hospital concerning the extent of her injuries.

A defendant is entitled to cross-examine a witness concerning those matters which would show that witness' bias or motive or which discredit that witness' testimony. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 441-42, 521 N.E.2d 38; *In re W.D.* (1990), 194 Ill. App. 3d 686, 702, 551 N.E.2d 357.) Wide latitude is afforded a defendant to show bias; however, the court is vested with broad discretion to restrict repetitive or unduly harassing interrogation. (*People v. Sanders* (1986), 143 Ill. App. 3d 402, 407, 493 N.E.2d 1; *People v. Betts* (1983), 116 Ill. App. 3d 551, 555, 451 N.E.2d 1028.) Correspondingly, a court may preclude cross-examination where no proof as to competency or relevancy is offered or that offer is unsatisfactory. (*People v. Winfield* (1983), 113 Ill. App. 3d 818, 831, 447 N.E.2d 1029.) Thus a reviewing court's "substantial discretion" will be reversed only where an abuse of that discretion results in manifest prejudice to the defendant. *Thompkins*, 121 Ill. 2d at 441-42.

In the instant case, defendant attempted to cross-examine Anderson regarding any current drug use; Anderson, however, denied any recent drug use and stated that she had been drug-free for at least 18 months. The circuit court, after asking defense counsel whether he could substantiate his suggestion that Anderson's current drug use prevented her from having custody of her son, limited defense counsel's questioning, characterizing it as "just gross character assassination if you have no basis to back it up." Defense counsel was unable to present any proof that the reason for Anderson not having custody of her son was different from those she provided: she was a full-time student and she was unemployed.

Nevertheless, defendant maintains that, like the defendant in *People v. Garrett* (1976), 44 Ill. App. 3d 429, 358 N.E.2d 364, he was sub-

stantially prejudiced by the court's restriction of his cross-examination of a witness concerning her recent drug use. *Garrett* differs, however, on one significant point—the *Garrett* defense counsel argued that he could substantiate his claim that a witness was admitted for drug use to a hospital three weeks before trial. The *Garrett* court found that it was error for the circuit court to restrict the defendant's cross-examination where "[d]efense counsel indicated that he could link up this admission to the hospital with [the witness'] testimony that she had not taken any drugs [for several months]." *Garrett*, 44 Ill. App. 3d at 438.

■ Contrary to *Garrett*, we find untenable defendant's assertion that Anderson's testimony that she did not have custody of her son was enough support to suggest that she still used drugs. Similarly, his contention that the routine drug screening requirement of her probation for the Federal charge suggests recent drug use is not borne out by the record; rather, the record indicates that the drug screening requirement was simply an agreed-upon condition of probation in exchange for Anderson's guilty plea. Accordingly, we find that the circuit court did not abuse its discretion in limiting defendant's cross-examination of Anderson regarding any current drug use.

Defendant further argues that the circuit court erred in limiting his examination of Anderson regarding the instructions which she received from the hospital. He maintains that he should have been allowed to show that Anderson's testimony concerning her injuries and the treatment required differed from the hospital's discharge instruction sheet. In the case *sub judice*, the court restricted defendant's cross-examination of Anderson, finding that the discharge instruction sheet was inadmissible under the business records exception to the hearsay rule. See 134 Ill. 2d R. 236(b).

■ We find that the circuit court did not abuse its discretion in limiting defendant's cross-examination of Anderson regarding the instructions she received from the hospital. Not only did the court properly restrict the introduction of the discharge instruction sheet, but, as the State correctly argues, defendant failed to establish that the discharge sheet contained all the instructions received by Anderson. Dr. Baig could have given specific instructions to her beyond what was contained in the discharge sheet. Thus, even if the discharge sheet had been admitted into evidence, its efficacy to impeach Anderson is questionable.

### III

Defendant next asserts that the court erred in allowing the intro-

duction of prejudicial hearsay; specifically, he maintains that Anderson's testimony about a police officer's statement to her was inadmissible hearsay and that Watkins' testimony regarding what hospital personnel told her about Anderson's eye was also inadmissible hearsay.

In the instant case, defendant attaches error to Anderson's testimony that, while she was at a preliminary hearing regarding the charge against defendant, he looked at her and "he said, 'Don't do this to me', *** I was a bundle of nerves and I was shaking [so Watkins] did like—this little thing like hold my hand and she said, 'Don't let him get to you.' " Defendant's objection as to what Watkins told Anderson was sustained. Defendant also claims error in Watkins' testimony that she told defendant, "I had spoke[n] with South Chicago Hospital [and] they had told me that Miss Anderson might lose her eye as a result of the beating." The court overruled defense counsel's objection as to what hospital personnel had told Watkins, finding that the statement was not introduced to prove the truth of the matter asserted but rather "to lay the foundation as to the next remark." That next remark was defendant's response that he "did not give a fuck" if Anderson lost her eye.

Hearsay is testimony of an out-of-court statement offered to prove the truth of the matter asserted, the value of which rests on the credibility of the one who made the statement. (*People v. Miles* (1988), 176 Ill. App. 3d 758, 764, 531 N.E.2d 891.) The reason for excluding hearsay evidence is the absence of an opportunity to determine its veracity. (*People v. Rogers* (1980), 81 Ill. 2d 571, 577, 411 N.E.2d 223.) The admission of hearsay evidence, although error, is harmless beyond a reasonable doubt where there is no reasonable possibility that the outcome of the trial would have been different had the hearsay been excluded or, as otherwise stated, where there is overwhelming evidence of guilt. (*People v. Negron* (1991), 220 Ill. App. 3d 754, 769, 580 N.E.2d 1301; *Miles*, 176 Ill. App. 3d at 764.) Correspondingly, a trial court's prompt action in sustaining an objection and instructing the jury to disregard the improper testimony serves to cure any prejudice suffered. *People v. Paino* (1985), 137 Ill. App. 3d 645, 650, 484 N.E.2d 1106.

■ In the instant case, the court properly sustained defendant's objection as to what Watkins had told Anderson during the preliminary hearing. Nonetheless, contrary to defendant's assertion that severe prejudice resulted from the statement despite the sustained objection, Anderson's testimony merely showed that she was nervous and Watkins reassured her. The statement neither harmed nor preju-

diced defendant's right to a fair trial, particularly where there was substantial evidence of his guilt.

Moreover, although defendant asserts that Watkins' testimony concerning what hospital personnel told her was hearsay, the circuit court was correct in ruling that it was not offered for the truth of the matter asserted, but was elicited only to show defendant's remorseless response. Furthermore, contrary to defendant's assertion, that statement did not prejudice him by exaggerating Anderson's injuries, but was merely cumulative; the jury heard testimony from Anderson, Lambur, and Dr. Baig concerning the extent of her injuries. (See *Miles*, 176 Ill. App. 3d at 764.) Accordingly, we find that the complained-of statements did not prejudice defendant.

IV

Defendant next contends that he was deprived of his right to a fair trial by numerous instances of prosecutorial misconduct. Specifically, defendant maintains that the prosecutor unfairly aligned himself with the jury; improperly bolstered the testimony of a State witness; improperly aroused the jury's passions and shifted the burden of proof; and improperly attacked defense counsel.

Defendant contends that the prosecutor improperly aligned himself with the jury by stating during opening, "We represent the community. The same community that you represent as jurors *** in this case," and arguing during closing, "We represent the People of the State of Illinois. But you are the People of the State of Illinois." For support defendant relies upon *People v. Johnson* (1986), 149 Ill. App. 3d 465, 500 N.E.2d 728, where the prosecutor unfairly aligned himself with the jury by referring to "our job" to find the facts, and upon *People v. Vasquez* (1972), 8 Ill. App. 3d 679, 291 N.E.2d 5, where the prosecutor improperly aligned himself with the jurors by telling them he was "the thirteenth juror" in the case.

■ Unlike those made in the instant case, the statements in *Johnson* and *Vasquez* improperly attempted to portray the State as an impartial member of the adversarial system. The State in the case at bar, however, accurately stated that it represented the people of the State of Illinois and did not suggest that it was either a member of the jury or its role was similar to the jury's. Thus, we find that the State's remarks were not so flagrant or inflammatory as to substantially prejudice defendant. See *People v. Edwards* (1991), 218 Ill. App. 3d 184, 195-96, 577 N.E.2d 1250 (State's remark in closing that "[W]e, the People of the State of Illinois, me and Mr. Burke, who represent the People, we represent you, represent everyone in the court-

room, even in a manner of speaking the defendant, to present reliable, credible, evidence before the court and you are to determine that in the final analysis" held not to be improper alignment with the jury).

Defendant also contends that the prosecutor improperly bolstered the testimony of a State witness by arguing in closing that the witness should be believed more than others because of her office: "Where is the motive to lie for any of these persons? *** Is it going to be Assistant State's Attorney Lambar [sic]? Is she going to lie about the injuries to the defendant's face? Is she going to risk her 20 years of schooling, her license to practice law in the State of Illinois and elsewhere so she can lie to pin a case to some guy she had never seen before?"

For support defendant relies upon *People v. Ford* (1983), 113 Ill. App. 3d 659, 447 N.E.2d 564, where the State referred to the only two witnesses in the trial as "on the one hand you have got Donna Kurlinkus. She is a sworn Warren County Deputy, and on the other you have got Paula Ford who, in the words of her attorney, is a drug addict." The prosecution in *Ford* further asked the jury "[w]hy would *** a sworn Warren County Deputy, pull a charade like this and lie and perjure herself for a lousy 15 gram purchase of marijuana?" The court held that the manner in which the prosecutor made repeated references to the witness' status as a police officer and a sworn deputy was an improper attempt to enhance the credibility of his witness. *Ford*, 113 Ill. App. 3d at 661-62.

Unlike *Ford*, the prosecutor in the instant case did not repeatedly refer to the State's Attorney's testimony in order to enhance her credibility, but rather, mentioned the position of the witness only in developing his argument that none of the State's witnesses had a motive to lie. Nevertheless, though we find that the prosecutor's comment in the instant case did not rise to the level of error as found in *Ford*, we must express concern about the danger of a prosecutor's rash passing comment during closing argument tainting an otherwise fair trial.

Defendant further asserts that the prosecutor improperly appealed to the jury's passions and shifted the burden of proof when he remarked about Anderson, "Give her a fair trial. Think of her rights." Relying upon *People v. Beringer* (1987), 151 Ill. App. 3d 558, 503 N.E.2d 778, defendant argues that the prosecutor's comment warrants reversal.

In *Beringer*, the court found the State's argument in closing that, "What about [the victim's] rights[?] *** What about her right to grow

old, to have a family. Her rights are never considered in this case ***. *** I'm not asking you to convict on *** [sympathy], my client who didn't have a lawyer before she was destroyed; who didn't have a jury trial before she was taken out," was designed to arouse the sympathy and passions of the jurors and thus was improper. *Beringer*, 151 Ill. App. 3d at 562-63.

While attempts to arouse the passions and sympathy of the jury are improper and prejudicial, the remark by the prosecutor here did not rise to the level of prejudice suffered in *Beringer*; however, we again question the tactics of the prosecutor in the instant case. Though we cannot say that the prosecutor's comments denied defendant a fair trial given the overwhelming evidence of guilt, we do question the prosecutor's apparent persistence in walking the fine line between proper comment and prejudicial error.

Defendant's further contention that the State's comment shifted the burden of proof has no merit. Though defendant cites *People v. Tyson* (1985), 137 Ill. App. 3d 912, 920, 485 N.E.2d 523, for the proposition that shifting the burden of proof is clearly improper and prejudicial, that case involved the prosecutor arguing that the jury was "not presented with a theory of innocence" and insinuated that the defendant had a burden to present evidence to support his innocence; no such charge has been raised against the State in the instant case.

Defendant also contends that the State improperly attacked defense counsel by arguing that statements in defense counsel's closing were "completely ridiculous and perverse" and characterized defense counsel's cross-examination of Anderson as "a witch-hunt and a character assassination." Defendant also attaches error to the prosecutor's comment:

"This stuff about testimony being slanted? This attorney saying that [Watkins'] testimony is slanted. That's cheap. If the testimony is slanted then that officer lied. You know, let's call *** something by what it is. If the testimony was slanted, then that officer lied. No legal or $100 words thrown about by any lawyer up here is going to change anything."

Defendant further argues that the prosecutor suggested that defense counsel and defendant had fabricated testimony:

"The defendant's testimony in addition to show that he did not mean to do this, he mentioned the word malice aforethought. Remember when that came out of his mouth up here? *** I don't think he heard that on L.A. Law or Dragnet. I think maybe he was—I don't know where he got it. He seemed to know a lot about it though. Do you think he thought about his

testimony before he got up there? Malice aforethought? That's part of his conjured up lie that he told up there."

It is not improper to call the defendant or a witness a "liar" if conflicts in evidence make such an assertion a fair inference; however, the same cannot be said for assertions that defense counsel is engaging in trickery or misrepresentation in order to win acquittal for his client. (*People v. Emerson* (1983), 97 Ill. 2d 487, 497, 455 N.E.2d 41.) Correspondingly, comments disparaging the integrity of defense counsel and implying that the defense was fabricated at the direction of counsel are improper. *People v. Starks* (1983), 116 Ill. App. 3d 384, 394, 451 N.E.2d 1298.

In *Starks*, upon which defendant relies, the prosecutor characterized the defense as a "pack of lies" and "layer upon layer of lies"; the prosecutor further expressed chagrin that he and the jury had to listen to defense counsel's argument which was "the most ridiculous double talk that I have ever heard." He further stated that he was certain that the jury would not be "hoodwinked" or "fooled" by "that defense, that pack of lies you heard." The court found that these remarks, taken with the general disparaging tone of the State's argument, resulted in prejudice to defendant. *Starks*, 116 Ill. App. 3d at 394.

In the instant case, unlike *Starks*, the prosecutor's statements did not suggest that defense counsel had fabricated a defense, but rather referred to defendant's "conjured up lie." Likewise, the prosecutor's comment that defense counsel's suggestion of Watkins' "slanted" testimony was "cheap" merely referred to the manner in which defense counsel attempted to discredit Watkins.

Because an attorney is afforded substantial latitude in closing argument and a new trial is not to be granted unless the prosecutor's remarks are so prejudicial as to materially contribute to a defendant's conviction, we cannot reverse defendant's conviction based upon the instances of alleged prosecutorial misconduct. We find, based upon the overwhelming evidence of guilt, that defendant was prejudiced neither by each of the complained-of instances of alleged prosecutorial misconduct nor by the cumulative effect of those remarks. See *Keen*, 206 Ill. App. 3d at 955.

## V

Defendant next asserts that the circuit court erred in instructing the jury as to the elements of self-defense over defense counsel's objection. Specifically, defendant maintains that those instructions ran

counter to his theory of the case and thus weakened it in the eyes of the jurors.

In the instant case, the defense strategy was that, although defendant had struck Anderson, he did not have the requisite mental state for aggravated battery. The defense attempted to show that defendant did not intentionally or knowingly cause great bodily harm to Anderson, but rather only "reactively" and "reflexively" hit her in response to her scratching him. Accordingly, when the State tendered a self-defense instruction, the defense objected. The State argued, however, that the testimony of defendant himself put self-defense at issue: defendant testified that he hit Anderson "[i]n defense of myself" and caused Anderson's injuries "[i]n self-defense." When defense counsel asked him, "[w]hen you used the term 'self-defense' in describing your actions, by that do you mean that you were protecting yourself?" defendant replied, "I—yes, in a sense that's what I mean. I felt that I was being attacked." Over defense objection, the court instructed the jury on self-defense.

Both the State and the defendant are entitled to instructions presenting their theories of the case, if supported by evidence. (*People v. Davis* (1974), 18 Ill. App. 3d 173, 175, 309 N.E.2d 338.) This court, however, must be "particularly hesitant to require a court to give an instruction on its own motion where it may well have been part of the defense strategy not to have the instruction given." (*People v. Spataro* (1978), 67 Ill. App. 3d 69, 74, 384 N.E.2d 553.) Likewise, where neither the State nor the defense presents a self-defense instruction, it is not error for the trial court to comply with defendant's desire not to instruct the jury on self-defense. *People v. Hughes* (1982), 109 Ill. App. 3d 352, 362, 440 N.E.2d 432.

■ In the instant case, although the defense objected to the self-defense instruction, the State was entitled to such an instruction based upon defendant's testimony at trial, stating that he acted in "self-defense" and was "protecting" himself when he hit Anderson. Nevertheless, even if the instruction was given in error, the evidence was so overwhelming that defendant did not "reactively" hit Anderson that any error was harmless. Anderson specifically testified that defendant began beating her when she would not have sex with him. Further, Watkins testified that defendant told her, "I don't let no bitch hit me in the face and get away with it"; defendant also told Watkins that he would "kick her ass" if he weren't handcuffed because "every woman needs to get their ass kicked." Likewise, the injuries suffered by Anderson are not consistent with a "reflexive" punch, but rather indicate a severe and violent beating. Accordingly,

we find that defendant was not denied a fair trial by the court's instructing the jury on self-defense.

## VI

Defendant lastly contends that the circuit court improperly sentenced him to an extended term. Specifically, defendant maintains that the circuit court placed undue emphasis on his prior conviction, failed to properly consider mitigating factors, and expressed bias against him.

A trial court may sentence a defendant to an extended term when that defendant is convicted of any felony, after having been previously convicted of the same or greater class of felony, when such conviction occurred within 10 years after the previous conviction, excluding time spent in custody. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(1).) In the instant case, defendant pled guilty to a charge of armed robbery in 1978 and was released from State custody in May or June 1980, slightly less than 10 years prior to the trial at bar. Thus, notwithstanding defendant's contention, although the court in the instant case partially granted a defense motion *in limine* regarding the use of defendant's remote past conviction during trial, it properly considered defendant's 1978 conviction during sentencing. See Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2.

■ Defendant also asserts that the court failed to consider mitigating factors, such as his family situation, his college studies, and his rehabilitative potential. Here, however, the court recognized, in mitigation, that for a long period of time "defendant did not commit any criminal offenses." The court further noted that "[t]here is other mitigation here. Defendant's family situation and other mitigation." The court, however, found there to be "quite a bit of aggravation here," and thus sentenced him to the maximum term. Defendant's argument that the court failed to consider the evidence in mitigation is thus not borne out by the record.

Correspondingly, defendant's further contention that the circuit court was biased against him is not supported by the record. Defendant points to two statements made by the court—one, the court's comment that defendant committed "obvious perjury" and two, the court's misquote of Anderson's testimony, stating *"This black guy fucked up your pretty face, didn't I."* (Emphasis added.) Characterizing the court's sentencing as "vindictive," defendant contends that the court lashed out at him with a "desire to punish defendant beyond what Illinois law allowed."

Defendant's sentence, though the maximum, however, is within the limits allowed by Illinois law (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—8—1(a)(6), 1005—8—2(a)(5), 1005—5—3.2(b)(1)); a reviewing court may not alter a sentence imposed by a trial court absent an abuse of discretion by the trial court, since the trial court is in a better position to determine an appropriate sentence. (*People v. Ward* (1986), 113 Ill. 2d 516, 499 N.E.2d 422; *People v. Wyatt* (1989), 186 Ill. App. 3d 772, 778-79, 542 N.E.2d 872.) In the instant case, we find that the circuit court heard extensive evidence in aggravation and mitigation and, accordingly, was in a better position to evaluate that evidence.

Based on the foregoing analysis, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN, P.J., and SCARIANO, J., concur.